**BRICCETTI, CALHOUN & LAWRENCE, LLP**
**81 MAIN STREET, SUITE 450**
**WHITE PLAINS, NY 10601**
**(914) 946-5900**

January 13, 2010

**BY HAND**
Hon. Stephen C. Robinson
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY   10601

  Re: United States v. Richard Genin
     08 Cr. 674 (SCR)

Dear Judge Robinson:

  This letter is submitted on behalf of Richard Genin in reply to the government's response dated October 2, 2009 ("Govt. Response"), to his renewed motion to suppress on the issue of the government's claim to the good-faith exception following the Court's determination that the search warrant application in this case failed to establish probable cause.

  The government complains at several points in its response that defendant's motion is not properly before the Court and should be rejected "at the outset" (Govt. Response at 1).  The government does not state what it means by "at the outset," though presumably it means "without considering the arguments in defendant's motion."  The government's complaints, however, overlook two important facts.  First, the defendant's renewed motion is before the Court because the Court expressly permitted it.  I asked the Court to be allowed to renew this aspect of Genin's original motion in open court on June 9, 2009, and Your Honor granted that request, and did so without any opposition from the government.  It is hard to understand how the government has arrived at the position that, now that it has been submitted, defendant's renewed motion ought to be rejected "at the outset."

  The government's complaint also overlooks the fact that Genin's request to renew this aspect of his motion was based in part on discovery received from the government <u>after</u> the Court's original decision dated January 26, 2009.  That discovery is very much relevant to the issue of good faith and had not been produced to Genin at the time his original motion was

Hon. Stephen C. Robinson, U.S.D.J.
Re:  United States v. Richard Genin
January 13, 2010
Page 2


decided.  In addition, significant new discovery also relevant to the issue of good faith has been produced by the government with its October 2 submission.  Perhaps the government would have less to complain about if its discovery disclosures were made earlier in the litigation.

In his renewed motion on the issue of good faith, Genin advanced the following arguments:


**1.    The Court's Decision On Probable Cause Was Based On
Clear Principles, Was Not New Or Novel Or A Close Call,
And Should Be Fully Applied to This Case.**

In his renewed motion on the issue of good faith, Genin reviewed the relevant case law from this circuit as well as consistent case law from other circuits.  Central to that review is the Second Circuit's decision in United States v. Jasorka, 153 F.3d 58 (2d Cir. 1998), issued ten years before the search warrant application in this case.  Although the Second Circuit decided the case on good faith grounds, it did not disturb or express any disapproval of the district court's invalidation of the warrant on probable cause grounds because of the agent's insufficiently detailed affidavit.  In Jasorka, the agent had asserted that the subject photos constituted a "lascivious exhibition of the genitals" under 18 U.S.C. §2256(2)(E), but provided no other information or description to the magistrate judge to permit an independent judicial evaluation of that assertion.  The district court concluded the affidavit was insufficient and the Second Circuit did not say otherwise.

As Genin pointed out, the affidavit in his case is actually worse than the one in Jasorka.  In Jasorka, the court at least knew which subsection of §2256 was in issue because the affidavit specified it.  Here, there is no way to tell.  The affidavit in Genin's case is less specific and less informative than the affidavit found to be deficient in Jasorka.

The government asserts that it is unreasonable to expect the agent to "extrapolate" from cases involving "lascivious exhibition," Govt. Response at 11, but it is not extrapolation that is called for.  Rather, it is the common sense recognition that an affidavit that is broader, less detailed and therefore more deficient than the one in Jasorka would not pass muster, at least not in this circuit.  If the agent chose to ignore that warning, which Jasorka clearly represented, he did so at his peril.

Hon. Stephen C. Robinson, U.S.D.J.
Re: United States v. Richard Genin
January 13, 2010
Page 3


      A host of other-circuit cases, previously cited by Genin, supports that conclusion. United States v. Battershell, 457 F.3d 1048 (9th Cir. 2006), United States v. Syphers, 426 F.3d 461 (1st Cir. 2005), and United States v. Brunette, 256 F.3d 14 (1st Cir. 2001). All of those decisions pre-date the search warrant affidavit in this case and all confirm the deficiency of that affidavit. The government, in a footnote (Govt. Response at 12, fn.6), counters with two other-circuit decisions, one of which pre-dates Jasorka, that evince a willingness by those courts to tolerate broad, undetailed assertions of "child pornography," even while criticizing the agent's showing as "minimal." See United States v. Simpson, 152 F.3d 1241, 1247 (10th Cir. 1998); see also United States v. Chrobak, 289 F.3d 1043 (8th Cir. 2002). It seems most unlikely that these decisions represent the law of this circuit, or that they should, or that they would even be so perceived.

      In another of the decisions cited by the government, a district court in Nebraska abandoned any pretense of meaningful legal analysis and used a barnyard term to describe the videos in issue, United States v. Grant, 434 F.Supp.2d 735, 747, fn.11 (D.Neb. 2006). The court went on to declare "Trust me, North Platte is not New York." Id. at 747, fn.12. I submit that New Yorkers should be grateful for that, at least in terms of constitutional protection. As the Grant decision makes abundantly clear, there is no reason to think that it represents the law in this circuit. There is also no reason that it should be accepted as reliable authority anywhere.

      The agent's affidavit in this case did not come close to meeting the standard in this circuit that he could have easily determined. Jasorka had been on the books for ten years, and the agent's search warrant affidavit here was even more deficient than the one at issue in Jasorka. The consequence of that failure should not await some future case. The future is now; it should be applied to this case.


    **2.**    **Discovery Reveals That No One Had Determined That The Images Were In Violation of 18 U.S.C. §2256.**

      In its October 2, 2009, response to Genin's renewed motion, the government has submitted a new affidavit from the agent ("Agent's Affid.") and has produced as exhibits to its agent's affidavit several documents it had not previously made available in discovery, specifically Exhibit A which is a compact disk of two videos prepared for the agent and Exhibits C (a July 10, 2007 report that set forth the analyst's methodology and definitions) and D (a chart of her review of the videos) representing the work of the IIU Analyst. No explanation is offered as to why these items are only coming to light now. In addition, the affidavit by the agent sets forth factual assertions that not only have never been made before, again without explanation, but actually are inconsistent with the government's first submission on Genin's motion.

Hon. Stephen C. Robinson, U.S.D.J.
Re:  United States v. Richard Genin
January 13, 2010
Page 4


While the newly disclosed documents and factual assertions are meant to shore up the agent's basis for applying for the search warrant and thus presumably his good faith, a close examination establishes that they do no such thing.  In fact, they raise more questions than they answer about his basis for believing that Genin possessed materials that met the definition of child pornography found in 18 U.S.C. §2256.  As shown below, the newly disclosed documents and new factual assertions actually establish that the agent (a) did not have sufficient direct knowledge himself of that fact, but instead (b) went forward based on the work of an analyst that was so infected with huge, obvious errors that it could not have been relied on in good faith, and (c) did little or nothing to supplement or update the stale information that he presented in the affidavit.


### (a)    The Agent's Undisclosed Viewing of Two Videos.

For the first time, the government asserts in its response to Genin's renewed motion that the agent himself watched a CD containing two videos he suspected Genin of possessing.  The agent in his affidavit claims to have watched, "in part," the videos D5 and I4[1] and concluded that they both contained "child pornography," all before providing his affidavit in support of the search warrant to the magistrate judge.  Agent's Affid. at ¶4.

It is remarkable that this assertion is being made now, for the first time, a year and a half after the agent's application in support of the warrant.  It is difficult to fathom a legitimate reason why the agent would rely completely on an analyst's determination of pornography in order to obtain the warrant instead of disclosing to the Court that he had viewed two of the subject videos himself.  By leaving out this information, he implicitly was claiming that he had no direct visual knowledge of the contents of the videos, and in effect preempting the magistrate from even asking any questions about the content of the videos.[2]  It is equally hard to understand why the government chose not to disclose this information when Genin's motion was first presented.  Instead, it argued that it was perfectly reasonable for the agent to rely on the work of the analyst, discovery of which had not been provided to the defense at that time.  (Govt.'s Memorandum of

---

[1] The affidavit does not identify the videos he viewed by anything other than the D5 and I4 designation.  Presumably, they are the Daphne #5 and Irina #4 videos referred to in Exhibit D to the affidavit, the analyst's chart, but that is not made explicit or certain in the affidavit.

[2] Not only did the agent not inform the magistrate judge that he received this CD and viewed it, he did not provide in his affidavit the analyst's July 302 report (Exhibit C to the agent's affidavit) that set forth her deeply flawed methodology for reviewing the videos (see (b) below), further implicitly understating the extent of the knowledge he possessed.

Hon. Stephen C. Robinson, U.S.D.J.
Re:  United States v. Richard Genin
January 13, 2010
Page 5


Law dated December 24, 2008, pp.10-11).  While the government now states that "First, and most significantly, [the Agent] received from the IIU a CD containing (these) two videos" (Govt. Response at 6), no explanation is given why this "most significant" information was not one of the first things disclosed to the Court.  Instead, it appears that the agent neglected to inform the magistrate judge that he had watched both videos and had determined their illegal content, yet preferred to rely on undisclosed information by an unnamed analyst.  No basis on which to claim good faith can be found here.

The government has chosen to disclose this information now for the ostensible purpose of supporting its claim that the agent had a firm basis for believing Genin possessed child pornography.  However, the information fails to do that.

Taking the video identified as "I4" first, there is no evidence that Genin ever possessed that video.  Rather, the belief that he did stems from a typographical error that the analyst appears to have made, one of a number of errors that neither the agent nor the analyst nor individuals at IIU ever caught or corrected.  In Exhibit B to the agent's affidavit, on page 4, a June 8, 2006, e-mail is sent to OPERATOR stating:

> In case you've lost track, I already have Daphne #s
> 1, 2, 3, +4, Kristina #s 1, 2 + 3, Angelina # 3, as
> well as I4 others by Anastasya, Anja, Nadia,
> Daphne and Irina, and Larisa and older Kristina.

First, the "I4" makes no sense grammatically in this sentence and obviously is meant to be the number "14."  Second, all of the other names of the models are spelled out in their entirety and the pound sign (#) precedes the numbered videos, which should have called even more attention to the "I4" error.  The original e-mail clearly shows that the sender was not making a reference to "I4;" he typed the number "14" and meant the number "14." (Exhibit E, page 10312), as set forth below:

> In case you've lost track, I already have Daphne #s
> 1, 2, 3 + 4, Kristina #s 1, 2 + 3, Angelina # 3, as
> well as 14 others by Anastasya, Anja, Nadia,
> Daphne and Irina, and Larisa and older Kristina.

Hon. Stephen C. Robinson, U.S.D.J.
Re:  <u>United States v. Richard Genin</u>
January 13, 2010
Page 6

      The FBI analyst transcribed the e-mail incorrectly when excerpting it, and made it appear that the e-mail sender had "I4" when that is not what he wrote; he wrote he had "14" other videos.  The typo not only was never detected, it went on to assume significance in the agent's purported investigation of this matter.

      This error was one of many by the analyst, whose work was substandard and should not have been relied on.  (See Section (b) below).  Worse, this error is the only basis for placing the video I4 on the CD, which the agent now asserts he viewed, when there is no basis to believe Genin ever purchased or possessed this video.[3]  Finally, and worst of all, this error was never detected by the agent, or by the analyst, or by anyone else at IIU, despite the fact that the e-mail excerpt made no sense.  It is of grave concern that the agent states that I4 was believed by individuals at IIU to have been purchased by Genin from the YVM website (Agent's Affid. ¶3), and presumably believed by the agent also, when the only way to believe it was on the basis of an obvious, nonsensical typographical error.  The way a typographical error here slid through, metastasized and was never detected bespeaks a lack of attention and real investigation.  Proceeding this way, headlong and with blinders on, is not consistent with a claim of good faith.

      The other video the agent asserts he viewed, called "D5," adds nothing to this claim either.  In the first place, the agent states he watched the video only "in part," but he does not state what part he watched.[4]  Agent's Affid. ¶4.  According to his affidavit, as a result of his recent viewing of D5, he determined there was illegal content in that video, but it is not clear at all what he saw before the search warrant affidavit was provided because he does not describe what he saw.  He asserts he concluded at that time that the video contained "child pornography," but does not describe the pornography or provide any basis for that conclusion.  Without a description of what "part" of the video the agent watched, it is impossible to attach any legal significance to his broad claim or to his conclusion.  That is precisely what Your Honor found in ruling that probable cause had not been established by the affidavit.

      The disclosure that the agent viewed these two videos prior to the search warrant affidavit prompts at least two questions: first, why is this only being disclosed now?  No answer is provided by the government and no answer that supports the government's position is apparent.  Second, what does this belated disclosure mean in terms of good faith?  The answer to that question is clear: nothing at all.  A viewing of one video Genin never ordered or possessed, but

---

[3] In the unexcerpted e-mails, the sender never expresses an interest in I4, never orders it, and never possessed it.  Further, it was not among the DVDs seized by the FBI from Genin's apartment.

[4] The agent says the same thing about his viewing of "I4."

Hon. Stephen C. Robinson, U.S.D.J.
Re: <u>United States v. Richard Genin</u>
January 13, 2010
Page 7

was thought to have as a result of a careless typo ignored and undetected, and the viewing of another video "in part" without any effort to describe it, or divulge what part he saw, add nothing to the claim for good faith. In fact, by any reasonable measure, they subtract from it.

      **(b)**      <u>**The Agent's Reliance on the Analyst.**</u>

      Instead of relying on any direct knowledge he may have possessed, the agent relied almost exclusively on the work of an FBI analyst in an attempt to establish a link between child pornography and Richard Genin. However, the analyst's work was completely incompetent, and that fact must have been apparent to the agent because it would be obvious to an experienced officer looking at it. The agent asserts he is well-trained, but apparently never investigated the errors made by the analyst. Dr. Leonard indicated that because the agent assumed that Genin was guilty, he abandoned his appropriate role as data gatherer. The analyst's errors were overlooked and casually dismissed which resulted in the agent's failure to correct them in order to insure that the magistrate judge was presented with accurate and legally sufficient information. The error-ridden work of the analyst became the centerpiece of the agent's affidavit. His reliance on her work and the work of his colleagues at the IIU was not objectively reasonable.

      The errors of the analyst were not limited to obvious but undetected typographical errors, and there were more of them than just the "I4" fiasco described above. For example, on the first page of her November 7, 2007, report concerning the e-mail excerpts, the analyst purports to excerpt an e-mail from "21/08/<u>2008</u>," another obvious typo (Agent's Affid., Exh. B, p.1). The analyst's excerpts of the April 22, 2006 e-mail (Agent's Affid., Exh. B, p.2) contain at least five more obvious typos that do not appear in the original e-mail (Agent's Affid., Exh. E, pp.10269-10270). None of these errors was corrected and none led the agent to request or examine the original e-mails. These errors should have caused concern to the agent over the quality of the analyst's work.

      That concern about the analyst's work should have grown into full-blown mistrust when the agent read the analyst's July 10, 2007, report (Agent's Affid., Exh. C) and the definition of child pornography the analyst set forth therein. The analyst first defined child pornography in the videos as depicting a minor engaging in sexually explicit conduct as defined in 18 U.S.C. §2256. That would have been the correct definition if she had left it alone and actually followed it. However, she does neither. Instead, she proceeds to make up various subcategories of child pornography (CP), such as "CP-Clothed," "CP-Partially Naked," and "CP-Naked," each of which involves, to her, a "lascivious exhibition of the victims' genitals, pubic area or anus," among other things. This is not the statutory definition, which for starters says nothing at all about anal exhibitions. Nor does the analyst explain how a clothed model could lasciviously exhibit her

Hon. Stephen C. Robinson, U.S.D.J.
Re:  United States v. Richard Genin
January 13, 2010
Page 8

genitals, pubic area or anus.  Further, the analyst's made-up category of "CP-Partially Naked" makes no sense, one is either naked or is not, and also does not comport with Dost factor number 4, noted by the Court in its prior decision.  In the analyst's chart (Agent's Affid., Exh. D), it appears sufficient to meet her definition of CP-Clothed if the "camera focuses on genital area and buttocks" even though the model is clothed, and of CP-Partially Naked if the camera is similarly focused and a breast is exposed.  The statutory definition of child pornography says nothing about breast exposure either.

      What the agent should have noticed, but apparently did not or was willing to overlook, was that the analyst had stretched the definition to child pornography well beyond its statutory terms.  Her inclusion of items in her definition of child pornography that are not contained in the statutory definition was plainly set forth in her July 10 report (Exhibit C) and her chart (Exhibit D) and rendered her entire work suspect.[5]  Because she applied a definition of child pornography other than the one set forth in 18 U.S.C. §2256, the agent could not have responsibly relied on her findings in presenting his affidavit for a search warrant to the magistrate judge.  The magistrate could not have known that the analyst applied an expanded and incorrect definition of child pornography, but the agent did know or at least should have known.  The agent possessed the report of the analyst showing the flawed methodology and definitions (Exhibit C) and had the information that some of the videos had never come into Genin's possession, yet did not disclose any of those facts to the magistrate judge.  And, of course, he did not disclose that he had viewed any part of any of the videos.

---

[5] The first indication of this problem came when I viewed several of the videos that the analyst labeled as child pornography and found that they contained nothing even approaching the standards in 18 U.S.C. §2256.  See my letter motion dated July 31, 2009, page 7 and fn.3.  For example, the "Anja" DVD depicts a single young model, clothed in a two-piece swimsuit, going through a series of poses.  The analyst claims that the "camera focuses on genital area" (Agent's Affid., Exh. D, p.4 of 16) but an occasional focus on a bikini bottom without any display of genitalia is all that appears in the video.  Contrary to the government's assertion that "reasonable minds could differ" on the presence of pornography (Govt. Response at 9, fn.2), there is no room to differ on this video if the correct standard is applied.  It does not constitute child pornography.

Hon. Stephen C. Robinson, U.S.D.J.
Re:  United States v. Richard Genin
January 13, 2010
Page 9


      The analyst's supposed review of "21 videos that were believed to have been purchased by Genin" (Govt. Response at 9) lacks legal significance when she applies her own definition of child pornography rather than the correct one.  It also lacks credibility when the "21 videos" include videos Genin never purchased or possessed.[6]  The entirety of her work should have been rejected and sent back to be done right.  Instead, it was made the centerpiece of the agent's affidavit.

      The government's recent disclosures also point to another flaw in the analyst's work.  Her entire review of the videos rests upon one central and critical assumption, i.e., that the videos she reviewed on the hard drive she obtained from Europol were identical to the videos that OPERATOR was shipping to his customers.  Remarkably, however, that assumption is never tested or confirmed as it could have been with admissions from OPERATOR, or comparisons between videos prepared for distribution (or actually distributed to an undercover buyer) and the videos on the Europol hard drive.  The evidence recovered from OPERATOR has not been described[7] nor have the OPERATOR's e-mails been analyzed, but it is clear that OPERATOR was not distributing the hard drive; allegedly, he was distributing individual DVDs to Genin and others and made videos available to be downloaded by computer, although there is no allegation Genin acquired any videos that way.  Based on this record, there is no way to know if the videos on the Europol hard drive, the provenance of which is entirely undisclosed, are the same as the

---

[6] "I4" is not the only video from this group the analyst, and presumably the agent, mistakenly thought Genin possessed.  Similarly, Genin never ordered or possessed N2 and N4.  In the August 20, 2005, excerpt, Genin expressed an interest in N2 and N4 but the next day, in the August 21, 2005, excerpt, orders a group of videos at OPERATOR's suggestion that does not include N2 and N4.  Agent's Affid., Exh. B, p.1.  Similarly, Genin expressed interest in videos Angelina 1 and 2 (Exhibit B, p.4) but in fact never ordered or possessed them, according to the full-text e-mails (Exhibit E).  Nevertheless, these videos, like I4, are treated by the analyst as if Genin had acquired them.  Exhibit B, p.6.  Perhaps these errors could have been avoided had the analyst excerpted any of OPERATOR's e-mails or if Genin's e-mails had been read more carefully.

[7] The search warrant affidavit states only that 150 "movies" were seized from OPERATOR, Agent's Search Warrant Affid., ¶10, but no disclosure has been as to the format of these "movies," their titles, or how or when or by whom the "movies" were transferred onto a hard drive, if that indeed is what happened.  The affidavit goes on to state that child pornography was formerly produced using "movies," Agent's Search Warrant Affid., ¶21, adding further depth to the question of what exactly was seized from OPERATOR.  It is also noteworthy that the warrant's Schedule A of items to be seized from Genin's apartment does not mention "movies."

Hon. Stephen C. Robinson, U.S.D.J.
Re:  <u>United States v. Richard Genin</u>
January 13, 2010
Page 10


DVD's that were distributed.  This flaw was as obvious as the others and clearly should have been detected before the search warrant affidavit was prepared and submitted to the magistrate judge.

      The multiplicity and seriousness of the analyst's errors, of both commission and omission, rendered reliance on her work untenable.  This is all the more because, as the defense has pointed out since the outset of this motion, no information was provided to the magistrate judge as to the analyst's name, training, background, qualifications and experience.  Nothing about her is disclosed in any submission by the agent or by the government, and her work was patently deficient.  It was not even clear in the search warrant affidavit if there was one analyst or more than one.  In any event, the analyst's work could not be relied on in a way that is consistent with an assertion of good faith.


      **(c)**      <u>**Lack of Investigation to Overcome Staleness.**</u>

      The effect of the agent's reliance on the analyst is exacerbated by an absence of any investigatory steps to determine if Genin indeed possessed child pornography in his home at the time of the warrant application.  The search warrant was issued on March 31, 2008, but there were no e-mails or excerpts from Genin after August, 2006, a full year and a half.  Further, he had provided a shipping address other than his home.  Agent's Search Warrant Affid., ¶18.  It does not appear that any investigation was done as to that address, or any surveillance done as to Genin, or any mail cover or interviews or review done as to deliveries he was receiving or taking into his home.  Although some decisions have recognized the hoarding tendencies of child pornography possessors, <u>see</u>, <u>e.g.</u>, <u>United States v. Irving</u>, 452 F.3d 110, 125 (2d Cr. 2006), those cases have little relevance here where no videos were downloaded to a home computer and the videos on DVDs were not delivered to the home address to be searched.

      Apparently recognizing the problem of the thinness of the information in hand and the related problem of the staleness of that information, Postal Inspectors twice sent an undercover solicitation of Genin to try to get him to place an order.  See Exhibit A attached to this letter.  Genin ignored these solicitations.  The government suggests that the agent's disclosure of these solicitations and of Genin's lack of response demonstrates the agent's good faith.  (Govt. Letter, p.10, fn.4).  It does not.  The dates of the solicitations were not provided in the search warrant affidavit, but they were November 13 and November 26, 2007 - a year and three months after Genin's last e-mail.  The lack of response should have suggested he had lost interest.  Further, the agent did not attach or quote the solicitations in his search warrant affidavit, but described them as "spam e-mail solicitations" in the affidavit (Agent's Search Warrant Affid., ¶20).  A

Hon. Stephen C. Robinson, U.S.D.J.
Re:  <u>United States v. Richard Genin</u>
January 13, 2010
Page 11


review of the solicitations discloses that they were not "spam"[8] at all, but standard e-mails directed to Genin and select others.  By labeling them as "spam," the affidavit mischaracterizes the nature of the solicitations and thereby understates the significance of Genin not responding to them.  It is one thing to ignore spam, or to filter it out so you never even see it; it is a different matter, and one far more significant, not to respond to repeated and directed solicitations to purchase the videos being offered.  Little in the way of good faith can be claimed when this distinction is ignored and the nature of the solicitations sent to Genin is misstated.

In the end, the solicitations yielded no results and the information in hand remained thin and grew even staler by the time of the warrant application on March 31, 2008.  The agent decided to go forward with the search warrant affidavit based upon the deeply flawed work of the analyst rather than his own work, which would not have supported the issuance of a warrant, and without any information at all about Genin's current activities and interests or about his possession of child pornography in his home, the place to be searched.


**3.     The Affidavit Employed Language and Techniques
         That Were Deceptive and Misleading.**

In the last section of his renewed motion, Genin reviewed the language employed in the agent's search warrant affidavit for its content, or lack thereof, and its phrasing that seemed to link purposefully Genin's e-mail messages to OPERATOR'S pornography.  This review was confirmed by the analysis of Dr. Robert A. Leonard, who found language in the affidavit invoking the schema of child pornography and designed to misdirect the magistrate judge as to Genin's connection with such material.  Dr. Leonard also noted the use of imprecise language and empty phrases by the agent as well as the fact that "the agent took what the analyst said at face value, connected it all to Genin and went from there," essentially becoming an adjudicator and advocate.  The preceding section establishes what a mistake it was to take the analyst in this case at face value.  Because the agent assumed that Genin was guilty, as Dr. Leonard pointed out, he believed a warrant should be issued and abandoned his proper role as an investigator and data gatherer.  The agent became a partisan and used the language of one, as detailed by Dr. Leonard in Genin's earlier submission.

---

[8] Wikipedia defines "spam" as the abuse of electronic messaging systems (including most broadcast media, digital delivery systems) to send unsolicited bulk messages indiscriminately.  The solicitations in Exhibit A were not bulk messages and were not sent indiscriminately.

Hon. Stephen C. Robinson, U.S.D.J.
Re: <u>United States v. Richard Genin</u>
January 13, 2010
Page 12

      The government has little to say about this. Its response is rich in adjectives ("patently absurd," "illogical," "nonsensical") but threadbare when it comes to substance. A central point in Dr. Leonard's analysis, that the language of the affidavit was manipulated to create the impression of a link that did not exist, is sidestepped by the government. The fact that Genin was e-mailing OPERATOR and purchasing videos from OPERATOR is repeated by the government no less than three times but the government does not respond to the conclusion of Dr. Leonard that a linguistic schema was employed to suggest a connection between OPERATOR's child pornography videos and the content of Genin's e-mails regarding child erotica videos.[9] The connection was subtle but false and manipulative and likely affected the magistrate judge's perception of the facts he thought were being presented. Additionally, the linking of the sale of the models' lingerie on the YVM website with Genin's appreciation of "their tiny outfits," Agent's Search Warrant Affid., ¶¶9, 16(c), was pure prejudice and designed to make Genin appear to be a "deviant" according to Dr. Leonard, and purposefully so, while lacking any legal significance.[10]

      The government questions what documents Dr. Leonard reviewed, but Genin's initial submission makes clear that Dr. Leonard reviewed the search warrant affidavit and other documents relevant to the case and, after doing so, he analyzed the search warrant affidavit. The government does not begin to offer anything to contradict Dr. Leonard and his views thus stand unrebutted.

      Dr. Leonard noted at page 6 of his report that the agent had strayed from describing the facts in the affidavit and veered into adjudicating Genin guilty of possessing child pornography and serving as an advocate for a particular outcome: the issuance of a search warrant for Genin's home. A straightforward appraisal of the reliable facts the agent had in hand at the time, presented in a straightforward manner, did not support this outcome, but it was achieved anyway through a flawed appraisal and skewed presentation. As the Court previously concluded, probable cause was missing from the affidavit. The defendant submits that also missing is any

---

[9] In none of his numerous e-mails does Genin describe or request child pornography. As the government's lengthy quote of one of his e-mails shows (Govt. Response at 7), and the rest of his e-mails also demonstrate, his interests were in child erotica, not child pornography as it is defined by 18 U.S.C. §2256.

[10] Your Honor noted in the Court's January 26, 2009 Decision that "jurors (and judges) need neutral references and considerations to avoid decisions based on individual values or the revulsion potentially raised in a child pornography prosecution." <u>United States v. Rivera</u>, 546 F.3d 245, 252 (2d Cir. 2008). The linking seen in the affidavit is not neutral and does not assist in avoiding decisions based on individual values or revulsion.

Hon. Stephen C. Robinson, U.S.D.J.
Re:  United States v. Richard Genin
January 13, 2010
Page 13

legitimate claim to the good faith exception to excuse the execution of a warrant so lacking in probable cause.

## CONCLUSION

The agent claims, for the first time and without any explanation, that he received from IIU a CD of two of the subject videos and watched both of them "in part." He did not describe what he saw or append any images from the videos and did not recognize that one of the videos was never even ordered. Furthermore, by not providing this information to the magistrate judge, the agent in effect preempted the judge from asking him any questions about the videos or their contents.

The agent did not possess sufficient knowledge of his own, and had done little or nothing to update and supplement the stale information he had, and thus knew he could not obtain a warrant on that basis. Instead, he relied on obviously flawed and inadequate work and conclusions by an analyst, but overlooked or ignored the flaws, and also tried to link Genin to the possession of child pornography through misleading and faulty use of language. No reasonably well-trained officer would have proceeded this way, but the agent here had obviously concluded that Genin was guilty and the warrant a mere formality. Under these circumstances, both legally and factually, the government has not met its burden of showing entitlement to the good faith exception, and the items seized pursuant to a warrant that lacked probable cause thus should be suppressed.

Your Honor's consideration of the foregoing is appreciated.

Respectfully submitted,

s/

Clinton W. Calhoun, III

CWC/jlr

cc:     AUSA Sarah R. Krissoff (by hand)